United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CARTER CHANG,

Plaintiff,

v.

ZIMA INTERNATIONAL, INC.,

Defendant.

Case No. 24-cv-03230-MMC

**ORDER DENYING PLAINTIFF'S MOTION TO VACATE ARBITRATION AWARD; GRANTING DEFENDANT'S MOTION TO CONFIRM ARBITRATION AWARD**

Before the Court are plaintiff Carter Chang's ("Chang") "Motion to Vacate Arbitration Award" and defendant Zima International, Inc. d/b/a Dandy's ("Dandy") "Motion to Confirm Arbitration Award," both filed October 2, 2026. The motions have been fully briefed. The Court, having read and considered the papers filed in support of and in opposition to the motion, hereby rules as follows.

## BACKGROUND

"Dandy" is "a digital dentistry start-up." (See Doc. No. 1 Ex. A ("Complaint") ¶ 6.)

"On September 17, 2021," Chang "began employment at Dandy…as Head of Operations Strategy and Vertical Integration." (See id. ¶ 9.)

On September 29, 2023, Dandy and Chang entered into a "Performance Equity Grant" agreement ("PEG"), which agreement provided that Chang would receive "45,000-50,000 shares of Class A Common Stock…in exchange for…complet[ing] up to six (6) discrete milestones," referred to as "Performance Metrics." (See id. ¶ 17; see also Doc. No. 22 ("Campbell Decl.") Ex. 1 ("PEG") at 3-4 (setting forth requirements of Performance Metrics).) The PEG stated Dandy would "evaluate whether each of the Performance Metrics ha[d] been met within 30 days after each month through February 29, 2024,"

upon which date Chang would "separat[e] from employment" at Dandy. (See id. at 1.)

The PEG further provided that, "[i]n addition to the Performance Requirements, [Chang] ha[d] a duty to the company to use [his] best efforts to ensure the Company achieve[d] its goals and objectives." (See id. at 2) ("Best Efforts Provision"). Additionally, the PEG provided: "no amendments will be made to this Agreement unless agreed to in writing by both parties." (See id.) ("No Amendments Provision").

On May 29, 2024, Chang filed the instant action, alleging he "fully achieved Performance Metrics (i) through (iv)" (see Complaint ¶ 28), but that Dandy "breach[ed] the Agreement by not certifying Chang's achievements under the [a]greement, and refusing to grant shares Chang earned under the [a]greement" (see id. ¶ 29). Based thereon, Chang asserted the following seven Causes of Action: (1) "Breach of Contract"; (2) Breach of Covenant of Good Faith and Fair Dealing"; (3) "Violation of Business and Professions Code § 17200"; (4) "Negligent Misrepresentation"; (5) "Unjust Enrichment"; (6) "Failure to Pay Earned Wages (Labor Code § 204)"; and (7) "Declaratory Relief."

On July 2, 2024, the Court granted Dandy's Motion to Compel Arbitration and Stay Proceedings. (See Doc. No. 20.)

At issue in the parties' arbitration hearing was, as relevant here,[1] Chang's breach of contract claim, i.e., whether Dandy breached the PEG.[2] In particular, the arbitration hearing concerned: (1) "Whether Chang Satisfied Metric One – 2024 Planning and Launch"; (2) "Whether Chang Satisfied Metric Three – 100% Insourcing"; and (3)

---

[1] Chang is not challenging the arbitrator's ruling as to his Sixth Cause of Action.

[2] Prior to the parties' arbitration hearing, the arbitrator granted Dandy's Motion for Summary Disposition with respect to Chang's above-referenced Second, Third, Fourth, Fifth, and Seventh Causes of Action. (See Doc. No. 28 ("Julian Decl.") Ex. I ("Final Award") at 2.)

"Whether Chang Satisfied Metric Four - $20 Posterior Crown Cost of Goods Sold for 2 Months." (See Final Award at 17.)[3]

A "five-day [arbitration] hearing commenced on February 9, 2026[,] and continued through February 13, 2026" (see id. at 3), after which the arbitrator, on June 21, 2026, issued a final arbitration award ("Final Award") finding Chang "failed to satisfy" Performance Metrics One, Three, and Four and that he was "entitled to no relief" (see id. at 18-19).

By the instant motion to vacate, Chang moves, pursuant to 9 U.S.C. § 10(a)(4), "for an order vacating the July 2, 2026 Final Award in the arbitration," on the asserted "ground that the arbitrator exceeded or imperfectly executed his powers by reforming the parties' Performance Equity Grant" and by "decid[ing] issues not submitted and arbitrarily add[ing] terms to the contract." (See Doc. No. 22 ("Mot. to Vacate") at i:7-13.)

**LEGAL STANDARD**

Section 10 of the FAA "lists the exclusive grounds for vacating an arbitration award." U.S. Life Ins. Co. v. Superior Nat. Ins. Co., 591 F.3d 1167, 1173 (9th Cir. 2010).[4] Here, Chang relies on § 10(a), under which courts "may vacate an arbitration award where…'the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.'" Aspic Engineering and Construction Company v. ECC Centcom Constructors LLC, 913 F.3d 1162, 1166 (9th Cir. 2019) (citing 9 U.S.C. § 10(a)). "[A]rbitrators exceed their powers

[3] At the arbitration, "Dandy confirmed that it [was] not challenging the completion of metrics 2, 5, and 6." (See Final Award at 8.)

[4] Section 11 lists the grounds for "modifying or correcting the award," see 9 U.S.C. § 11(a), (b), (c), neither of which Chang is requesting. (See Mot. to Vacate at 19:11-15.)



United States District Court
Northern District of California

when the award is [1] completely irrational or [2] exhibits a manifest disregard of the law." Id. (internal quotation and citation omitted).

As to the first ground, complete irrationality, the Ninth Circuit has held the "standard is extremely narrow and is satisfied only where the arbitration decision fails to draw its essence from the agreement." Bosack v. Soward, 586 F.3d 1096, 1106 (9th Cir. 2009) (internal quotation and citation omitted). "An award draws its essence from the agreement if the award is derived from the agreement, viewed in light of the agreement's language and context, as well as other indications of the parties' intentions." Id. (internal quotation and citation omitted). "Under this standard of review, [courts] do not decide the rightness or wrongness of the arbitrators' contract interpretation, only whether the panel's decision draws its essence from the contract." Id. (internal quotation and citation omitted).

Consequently, "even if the [arbitrator] erred by making contradictory findings of fact, this does not render the decision completely irrational." Id. at 1106-07. "Only if the arbitrator acts outside the scope of his contractually delegated authority—issuing an award that simply reflects his own notions of economic justice rather than drawing its essence from the contract—may a court overturn his determination." Oxford Health Plans LLC v. Sutter, 569 U.S. 564, 569 (2013) (internal quotation and citation omitted). "[T]he sole question…is whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong." Id. "[C]onvincing a court of an arbitrator's error—even his grave error—is not enough." Id. at 572.

The second ground, a manifest disregard of the law, "requires something beyond and different from a mere error in the law or failure on the part of the arbitrator[] to understand and apply the law." Collins v. D.R. Horton, Inc., 505 F.3d 874, 879 (9th Cir. 2007) (internal quotation and citation omitted); see also Aspic, 913 F.3d at 1166 (holding "[n]either erroneous legal conclusions nor unsubstantiated factual findings justify federal

court review of an arbitral award") (internal quotation and citation omitted). "For an arbitrator's award to be in manifest disregard of the law, it must be clear from the record that the arbitrator recognized the applicable law and then ignored it." Bosack, 586 F.3d at 1104 (internal quotation and citation omitted; emphasis added); see also Collins, 505 F.3d at 879 (holding "to demonstrate manifest disregard, the moving party must show that the arbitrator understood and correctly stated the law, but proceeded to disregard the same") (internal quotation, citation, and alterations omitted).

"The burden of establishing grounds for vacating an arbitration award is on the party seeking it." U.S. Life Ins. Co., 591 F.3d at 1173.

## DISCUSSION

### I. Motion to Vacate[5]

Chang moves to vacate the Final Award on the asserted ground that the arbitrator, in determining Chang failed to satisfy Performance Metrics One, Three, and Four of the PEG, "exceeded or imperfectly executed his powers." (See Mot. to Vacate at i:10-11.) In particular, Chang argues, the arbitration "award…does not draw its essence from the [PEG] [a]greement." (See id. at i:14; see also Reply at 8:1-2 (internal quotation and citation omitted).)

[5] At the outset, the Court addresses Dandy's argument that Chang's motion is untimely on the ground that "a motion to vacate…must be served upon the adverse party or his attorney within three months after the award is filed or delivered," see 9 U.S.C. § 12, and Chang's motion was not filed until October 2, 2026, more than three months after the arbitrator's Interim Award was served on June 8, 2026. (See Opp. at 14:26-15:21.) Such argument is unpersuasive, as the arbitrator's Final Award was served on July 2, 2026 (see Julian Decl. ¶ 11), and there is no evidence that the Interim Award stated it was final or that the arbitrator intended it to be final. See Bosack, 586 F.3d at 1103 (holding "interim award may be deemed final…if the award states it is final, and if the arbitrator intended the award to be final"). Rather, the Final Award states that "two corrections" were made "to the Interim Award" and that the Final Award "resolves all issues submitted for decision." (See Final Award at 19.)

United States District Court
Northern District of California

**A. Performance Metric One: "2024 Plan Requirement"**

As to Performance Metric One, the PEG provided:

> "You are expected to complete planning for the year 2024 for all areas of the Company that you oversee (referred to as the '2024 Plan Requirement'). Your plans should take into account and align with the broader company goals and objectives and you are expected to continue working as a full-time employee at full capacity through your [s]eparation [d]ate to see through the launch of your 2024 plan."

(See PEG at 3.)

The arbitrator found "Chang failed to satisfy Metric 1 because his submissions were untimely and deficient." (See Final Award at 18.) In particular, the arbitrator found "Chang's final 2024 plan was submitted on November 15, 2023—over two weeks past the October 31 deadline," which "delay negatively impacted Dandy's executive leadership in preparing company-wide plans for the Board of Directors." (See id.) Additionally, the arbitrator found that "the quality of the initial draft was inadequate" because it "lacked clarity, focus, and proper prioritization," thereby causing "Chang's supervisor, Jerry Tang,…to step in and rewrite significant portions of the document," and that "Chang's final 2024 plan…was primarily authored by Tang, not Chang." (See id.)

Based on the above, the arbitrator, relying on the PEG's Best Efforts Provision (see supra at 2:2-5) as well as California case law holding "[a] contract to perform services gives rise to a duty of care which requires that such services be performed in a competent and reasonable manner," concluded "Chang's late and inadequate submission breached the 'best efforts' and competence standards required to satisfy Metric 1." (See id. (citing North American Chemical Co. v. Superior Court of Los Angeles County, 59 Cal.App.4th 764, 774 (1997)).)

Chang argues "Metric 1 by its terms does not impose any deadlines for drafts or revisions or state specific substantive criteria" (see Mot. to Vacate at 7:6-7) (emphasis

United States District Court
Northern District of California

omitted) and "prescribes no external 'quality' benchmark" (see id. at 15:4-5); thus, Chang concludes, the arbitrator "rejected the [M]etric based on language the arbitrator added to the PEG requiring a certain quality threshold on the initial draft and tardiness of the internal submission" (see id. at 9:8-9), and that "[m]easuring performance against requirements that parties never wrote into the Metric exceeded the [a]rbitrator's powers" (see id. at 15:14-15).

As noted above, however, the arbitrator, in finding Chang failed to satisfy Performance Metric One, interpreted the parties' agreement in light of a provision therein, namely, the Best Efforts Provision, as well as "an implied duty" therein, namely, a duty under California contract law "to perform in a competent and reasonable manner," and applied those express and implied terms to evidence of Chang's efforts and work product. (See Final Award at 18.) Under such circumstances, Chang has failed to show the arbitrator's finding that Chang failed to satisfy Performance Metric One "simply reflect[ed] his own notions of economic justice," see Oxford Health, 569 U.S. at 569 (internal quotation and citation omitted), and that such finding was not "derived from the agreement, viewed in light of the agreement's language and context, as well as other indications of the parties' intentions," see Bosack, 586 F.3d at 1106 (internal quotation and citation omitted).

Accordingly, the Court finds the arbitrator did not exceed his powers in finding Chang failed to satisfy Performance Metric One.

//

//

//

//

//

**B. Performance Metric Three: "100% Insourcing Requirement"**

As to Performance Metric Three, the PEG provided:

> All Dandy product lines, namely crowns and bridges made of Zirconia, PFZ, Emax or PFEmax, printed nightguards, printed dentures, and implants are expected to be manufactured at the Lehi Lab located at 1320 N. 300 W., Lehi, Utah 84043 (referred to as the '100% Insourcing Requirement').

(See PEG at 3.)

The arbitrator found "Chang failed to satisfy Metric 3 because Dandy never achieved 100% insourcing for all required product lines during the relevant period." (See Final Award at 18.) In particular, the arbitrator found that, "[t]o hit 100% insourcing under the [PEG] in any meaningful sense, the capacity had to be sustained, and orders had to be [met] on time" (see id.), and that "[u]nder no objective measure did Chang sustainably achieve 100% insourcing" (see id. at 19).

Chang argues "[n]either the word 'sustained' nor any concept of on-time delivery appears in Metric Three," but that the arbitrator "supplied both, and then used manufactured terms—not the term the parties wrote—to find Chang failed." (See Mot. to Vacate at 14:20-15:1.) Additionally, Chang relies on an internal data metric at Dandy, referred to as "Win as One," that, according to Chang, demonstrated he satisfied the "100% insourcing" requirement. In particular, Chang argues, "[i]t is undisputed that in January 2024, Dandy co-founders," relying on the "Win as One" metric, "announced to the company, and the board of directors, that the goal of achieving 100% insourcing at Lehi Lab was achieved." (See id. at 7:15-17.)

First, with regard to an implied requirement of "sustained," rather than sporadic, compliance, the PEG, as noted above, provided that Dandy would "evaluate whether each of the Performance Metrics ha[d] been met within 30 days after each month [from September 29, 2023,] through February 29, 2024" (see PEG at 1), i.e., a five-month

evaluation period, and the arbitrator found that in January 2024, "Dandy had to send more implant orders to third party labs" (see Final Award at 13 (citing to evidence that "[b]y January 28, 2024, the insource percentage for implants fell to 63%" and that "[i]n early February 2024, Dandy decided to send all or nearly all implant orders to third parties because Lehi could not service them")).

Second, as to an implied requirement of "on-time," rather than delayed, delivery, the arbitrator noted that, during the low-volume holiday period, Chang had been "explicitly warned…that the lab lacked the capacity to handle normal order volume"; further, the arbitrator found that "[w]hen the post-holiday orders hit, it caused a catastrophic backlog, forcing Dandy to route nearly 100% of its implant orders to third-party labs by early February 2024." (See Final Award at 18-19.)

Third, the arbitrator found Dandy's "Win as One" metric was a benchmark distinct from Performance Metric Three's "100% insourcing" requirement. (See id. at 18.) In that regard, the arbitrator found the "Win as One" metric "did not track the specific contractual requirements of Metric 3," but, rather, "was an employee morale-boosting target with different parameters (rewarded with bomber jackets)," not with additional stock grants (see id.), that "the Win as One 100% insourcing at Lehi was during the low-volume holiday period" (see id.), and that it "did not account for the delays and cancellations happening at Lehi in Q1 2024" thereafter (see id. at 12).

Given the above circumstances, Chang has failed to show the arbitrator "strayed from his delegated task of interpreting a contract" in finding "100% insourcing" was not achieved. See Oxford Health, 569 U.S. at 572 (holding courts cannot vacate arbitration award under § 10(a)(4) "[s]o long as the arbitrator was arguably construing the contract") (internal quotation and citation omitted).

Accordingly, the Court finds the arbitrator did not exceed his powers in finding Chang failed to satisfy Performance Metric Three.

**C. Performance Metric Four: "$20 Posterior Crown Target"**

As to Performance Metric Four, the PEG provided:

> Posterior Crowns[6] achieve a Cost of Goods Sold Target of twenty dollars ($20.00) per crown for a period of two (2) months prior to your [s]eparation [d]ate (referred to as the '$20 Posterior Crown Target').

(See PEG at 3.)

Chang argues the PEG stated "Cost of Goods Sold ['COGS'] will be defined by U.S. Generally Accepted Accounting Principles" ("GAAP") (see PEG at 3), and that "[t]he arbitrator did not interpret the GAAP term; he found it unworkable, declared a mutual mistake, and submitted a different measure (Dandy's internal accounting/management methods) that appears nowhere in in the PEG." (See Mot. to Vacate at 8:16-18.) By "expressly finding a mistake that required Metric Four of the PEG to be 'corrected,'" Chang argues, "the [a]rbitrator amended the PEG's performance terms without the parties' written agreement" (see id. at 17:2-4), and that the arbitrator's decision to "substitut[e] an extra-contractual standard does not draw the award's essence from the PEG" (see Reply at 6:14-15). As set forth below, and, contrary to Chang's argument, the arbitrator's decision with respect to Performance Metric Four was predicated on the parties' mutual intent to measure Chang's completion of said metric according to an objective measure, which metric both parties conceded could not be measured pursuant to GAAP.

---

[6] The PEG defines "Posterior Crowns" as "standard posterior crowns manufactured with the Company's Zirconia, and excludes anterior crowns." (See PEG at 3.)

It is undisputed that, at the time they entered the PEG, "the parties were not aware that GAAP does not address COGS." (See Final Award at 14). In that regard, both parties, in their arbitration briefs, stated they were unaware COGS for posterior crowns could not be measured by GAAP and, in light thereof, offered alternative metrics by which the arbitrator could measure Chang's completion of Performance Metric Four.

In particular, Dandy, in its pre-arbitration "Statement of Position" stated "[t]here was a mutual mistake by the [p]arties in believing that there was a way to calculate [COGS] for posterior crowns pursuant to GAAP" and proposed that "the arbitrator…apply Civil Code section 3399" (see Campbell Decl. Ex. 13 ("Dandy's Statement of Position") at 7:23-25), which section provides that, "[w]hen, through…a mutual mistake of the parties,…a written contract does not truly express the intention of the parties, it may be revised," see Cal. Civ. Code § 3399. Similarly, in its post-hearing briefing, Dandy argued "[t]he [p]arties mistakenly believed that…there was a way to calculate [COGS] for posterior crowns pursuant to GAAP," and that "[t]his misunderstanding require[d] the application of Civil Code section 3399." (See Campbell Decl. Ex 15 ("Dandy's Post-Hearing Arbitration Brief") at 14:16-19; see also id. at 15:21-22 (pointing out "the inclusion of the GAAP provision was a mutual mistake that did not reflect the true intent of the [p]arties").)

Chang, in his post-hearing brief, agreed that "[w]hile Metric 4 called specifically for objective accounting standards under GAAP, those standards [we]re not available and [would] not be available" because "GAAP does not contain a specific prescription governing the calculation of COGS for an individual product line." (See Campbell Decl. Ex. 14 ("Chang's Post-Arbitration Hearing Brief") at 18.) Chang further stated "[his] position ha[d] always been [that] the purpose of Performance Metric 4 was to ensure a fair and accurate evaluation of [COGS]," and, "[t]o address the [a]rbitrator's request for

guidance on the issue related to the express GAAP requirement of the contract,…request[ed] that Metric 4 be objectively evaluated using Dandy's new cost allocation method" (see id.), a proposal he reiterated in his post-hearing response brief, in which, after confirming "[t]he intent of the parties was to provide an objective and reliable measure for Metric 4," he stated he "would accept a calculation of COGS based on the new standard cost allocation," which measure "Dandy…adopted after [Chang] left the [c]ompany" (see Campbell Decl. Ex. 16 ("Chang's Post-Arbitration Response Brief") at 8).[7]

Thereafter, the arbitrator credited expert "[t]estimony from Certified Public Accountants…that GAAP does not provide a standard for calculating COGS for a single product line, rendering the contract's strict GAAP requirement a mutual mistake," and, in order to "[c]orrect[] this mutual mistake to reflect the parties' true intention[,] an objective measurement of costs[,]…look[ed] to Dandy's ordinary 'accounting' and 'management' calculations," the two methods by which Dandy, in the course of business, had been calculating COGS for the crowns. (See Final Award at 19.) "Under either metric," according to the arbitrator, "the cost never reached the $20.00 threshold," as required for Chang to satisfy Performance Metric Four. (See id.) In his briefing before the Court, Chang has not explained how the metric he proposed differed and, as Dandy points out, and Chang does not dispute, "Chang never identified any measure under which posterior crown COGS fell to $20." (See Opp. at 12:16-17; see also Final Award at 15 (finding "Chang presented no evidence that he satisfied metric 4").)

[7] Chang has not further described his proposed measure.



United States District Court
Northern District of California

Given the arbitrator's reliance on the parties' mutual intent of having Performance Metric Four evaluated according to an objective measure of COGS, and their respective requests to have him use an alternative method to the one they initially but mistakenly had selected, Chang has failed to show the arbitrator's decision did not "draw[] its essence from the agreement." See Bosack, 586 F.3d at 1106 (holding "[a]n award draws its essence from the agreement if the award is derived from the agreement, viewed in light of…indications of the parties' intentions") (internal quotation and citation omitted); see also Oxford Health, 569 U.S. at 572 (holding vacatur of arbitration award under § 10(a)(4) requires "a finding that [the arbitrator] misapprehended the parties' intent"); Aspic, 913 F.3d at 1168 (finding arbitrator's decision "irrational" under § 10(a)(4) where it adopted a position "neither party argued" for "in their arbitration briefs" and was contrary to a mutual position taken by both parties in "substantial portions of the parties' briefs").

Accordingly, the Court finds the arbitrator did not exceed his powers in finding Chang failed to satisfy Performance Metric Four.

**D. Conclusion: Motion to Vacate**

In sum, the Court finds the arbitrator did not exceed his powers in finding Chang failed to satisfy Performance Metrics, One, Three, and Four, and, accordingly, Chang's motion to vacate will be denied.

## II. Motion to Confirm

Dandy moves, pursuant to 9 U.S.C. § 9, to confirm the Final Award.

Section 9 of the FAA provides that "at any time within one year after the award is made any party to the arbitration may apply to the court…for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." See 9 U.S.C. § 9.

Here, given that the arbitrator's award will not be vacated, Dandy's motion to confirm will be granted.

**CONCLUSION**

For the reasons stated above:

1. Chang's Motion to Vacate Arbitration Award is hereby DENIED.
2. Dandy's Motion to Confirm Arbitration Award is hereby GRANTED.

**IT IS SO ORDERED.**

Dated: November 23, 2026

MAXINE M. CHESNEY
United States District Judge

United States District Court
Northern District of California